No. 13-15916

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

In re: *TFT-LCD (Flat Panel) Anti-Trust Litigation*

INDIRECT PLAINTIFFS CLASS
*Plaintiff-Appellee,*

ALEX MARTINEZ
*Objector-Appellant,*
v.

LG DISPLAY CO., LTD., *et al.,*
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of California, San Francisco
No. 3:07-md-01827-SI

---

APPELLANT'S OPENING BRIEF

---

John G. Crabtree
George G. Baise
Charles M. Auslander
CRABTREE & ASSOCIATES, P.A.
240 Crandon Boulevard, Suite 234
Key Biscayne, FL 33149
Telephone: (305) 361-3770
Facsimile: (305) 437-8118
jcrabtree@crabtreelaw.com
floridaservice@crabtreelaw.com
*Counsel for Objector*

*Additional Counsel;*

MICAH R. JACOBS
State Bar No. 174630
Email: mjacobs@jacobslawsf.com
JACOBS LAW GROUP SF
388 Market St., Suite 1300
San Francisco, California 94111
Telephone: 415-445-4696
Facsimile: 415-445-4697

BRIAN M. TORRES
Fla. Bar No. 036498
*Admitted Pro Hac Vice*
Email: btorres@sheftalltorres.com
SHEFTALL & TORRES, P.A.
One S.E. Third Avenue, Suite 3000
Miami, Florida 33131
Telephone: 305-358-5959
Facsimile: 855-996-9699

# TABLE OF CONTENTS

Table of Authorities.................................................................ii

Statements of Request for Oral Argument

Statement of Subject Matter and Appellate Jurisdiction..........................1

Statement of the Issues.............................................................1

Standard of Review.................................................................2

Statutes and Rules.................................................................2

Federal Rule of Civil Procedure 23(h). Class Actions...............................2

*Introduction*.......................................................................3

STATEMENT OF THE CASE..........................................................5

STATEMENT OF THE FACTS.........................................................8

    1.   IPP Class Counsel's Fee Request..........................................8

    2.   Objection Appealed Here................................................8

    3.   How IPP Class Counsel's Supported Their Fee Request....................8

    4.   Nature of the Objections...............................................10

    5.   The Special Master's Ruling ...........................................12

    6.   The District Court's Consideration of the Fee Amount ...................16

SUMMARY OF THE ARGUMENT.....................................................18

ARGUMENT.........................................................................19

I.    THE AWARD OF AN ATTORNEY'S FEE TO CLASS COUNSEL CONSTITUTING 28.6% OF THE COMMON FUND WAS AN ABUSE OF DISCRETION ............... 19

    1.    This case is like Wal-Mart, not Allapattah ..................................... 19

    2.     The amount of the percentage of the fund fee awarded here  was excessive when compared to similar large common fund cases. .... 25

    3.    The 25% baseline percentage-of-the-fund award should not have been deemed presumptively correct in this super mega fund case. .................................................................................. 33

    4.    Others factors do not support the 28.6% fee award to the class counsel ...................................................................................... 36

    5.    The risks and complexities of this litigation were not extreme risks or unduly novel. ........................................................................... 38

    6.    The Court should recognize the circuit conflict in determining how best to award fees in common fund cases ..................................... 42

II.    THE DISTRICT COURT ERRED IN ITS LODESTAR CROSS-CHECK, FURTHER DEMONSTRATING THAT THE AWARD OF FEES IS EXCESSIVE................................ 45

III.    THE OBJECTOR SHOULD BE AWARDED ATTORNEY'S FEES FOR INCREASING THE COMMON FUND, ASSUMING THEY PREVAIL ON APPEAL IN ANY MANNER THAT WOULD INCREASE THE FUND ................................................................. 49

CONCLUSION ................................................................................................ 51

STATEMENT OF RELATED CASES PURSUANT TO NINTH CIRCUIT RULE 28-2.6 .... 52

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(A)(7)(C)AND CIRCUIT RULE 32-1 ... 53

# TABLE OF AUTHORITIES

<u>Cases</u>

*Allapattah Services v. Exxon Corp.,*
454 F.Supp.2d 1185 (S.D. Fla 2006)..............................................................4

*Allison v. Citgo Petroleum Corp.,*
151 F.3d 402 (5th Cir. 1998)......................................................................30

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.,*
792 F.Supp.2d at 1033..............................................................................26

*In re Auction Houses Antitrust Litig.,*
No., 00 Civ. 0648(LAK),  (S.D.N.Y. Feb. 22, 2001) .......................................36

*Barbosa v. Cargill Meat Solutions Corp.,*
(E.D. Cal. May 30, 2013) ...........................................................................46

*In re Black Farmers Discrimination Lit.,*
2013 WL 3480346 ...................................................................................26

*In re Bluetooth Headset Products Liability Lit.,*
54 F.3d 935 (9th Cir. 2011)........................................................................33

*Chalmers v. City of Los Angeles,*
796 F. 2d 1205 (9th Cir. 1986)....................................................................46

*In re Checking Account Overdraft Litigation,*
830 F.Supp. 2d 1330 (S.D. Fla. 2011).........................................................27

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
216 F.R.D. 197 (D.Me.2003) ......................................................................36

*In re Continental Illinois Securities Litigation,*
985 F.2d 867 (7th Cir.1993).......................................................................44

*In re Continental Illinois Securities Litigation,*
962 F.2d 566 (7th Cir.1992).......................................................................44

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,*
109 F.3d 602 (9th Cir. 1997) .......................................................................44

*Craft v. County of San Bernadino,*
624 F.Supp. 1113 (C.D. Cal 2008) ................................................................17

*In re Domestic Air Transp. Antitrust Litig.,*
148 F.R.D. 297, 351 (N.D.Ga.1993)..............................................................29

*In re Enron Corp. Securities, Derivative & "ERISA" Litig.,*
586 F.Supp.2d 732 (S.D.Tex.2008)...............................................................28

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005) .....................................................................................24

*Fleury v. Richemont North America,*
2008 WL 4829868 (N.D. Cal. Nov. 4, 2008) .................................................50

*Florin v. Nationsbank of Georgia, N.A.,*
60 F.3d 1245 (7th Cir. 1995) ........................................................................44

*Frederick v. Range Resources-Appalachia, LLC,*
2011 WL 1045665 (W.D. Pa. March 17, 2011)...............................................39

*Gaskill v. Gordon,*
160 F.3d 361 (7th Cir.1998).........................................................................44

*Gen. Tel. Co. of the Sw. v. Falcon,*
457 U.S. 147 (1982) .....................................................................................30

*Goldberger v. Integrated Res., Inc.,*
209 F.3d 43 (2d Cir. 2000) ...........................................................................19

*In re High Sulfur Content Gasoline Prods. Liab. Litig.,*
517 F.3d 220 (5th Cir.2008)..........................................................................46

*In re Homestore.com, Inc.,*
2004 WL 2792185 (C.D. Cal. Aug.10, 2004) ................................................50

iv

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 ........................................................................................41

*Jenkins v. Raymark Indus., Inc.,*
782 F.2d 468 (5th Cir. 1986) ...............................................................30

*Keenan v. City of Philadelphia,*
983 F.2d 459 (3d Cir. 1992) .................................................................46

*Ko v.   Natura Pet Prods., Inc.,*
2012 WL 3945541 (N.D. Cal. Sept. 10, 2012) ....................................46

*In re Leapfrog Enterprises, Inc., Sec. Litig.,*
2008 WL 5000208 (N.D. Cal. 2008) ....................................................49

*Monterrubio v. Best Buy Stores, L.P.,*
2013 WL 2106085 (E.D. Cal. May 14, 2013) ......................................39

*Montgomery v. Aetna Plywood, Inc.,*
231 F.3d 399 (7th Cir. 2000) ...............................................................44

*In re Mercury Interactive Corp. Sec. Litig.,*
618 F.3d 988 (9th Cir. 2010) ...............................................................47

*Paul, Johnson, Alston & Hunt v. Graulty,*
886 F.2d 268 (9th Cir.1989) ..................................................................2

*Perdue v. Kenny A. ex rel. Winn,*
559 U.S. 542, (2010) ...........................................................................47

*Polonski v. Trump Taj Mahal Assocs.,*
137 F.3d 139, 147 (3rd Cirt. 1999) .....................................................50

*Powers v. Eichen,*
229 F.3d 1249 (9th Cir. 2000) .............................................................42

*In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions,*
148 F.3d 283 (3d Cir.1998) ..................................................................33

*Rawlings v. Prudential-Bache Properties, Inc.,*
9 F.3d 513 (6th Cir. 1993) .............................................................44

*Rodriguez v. West Publishing Corp.,*
563 F.3d 948 (9th Cir. 2009) .........................................................36

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.,*
2005 WL 1213926 (E. D. Pa. May 19, 2005) .................................40

*Schiller v. David's Bridal, Inc.,*
2012 WL 211701 (E.D. Cal. June 11, 2012) ..................................39

*Six Mexican Workers v. Arizona Citrus Growers,*
904 F.2d 1301 (9th Cir. 1990) .......................................................31

*Strong v. BellSouth Telecommunications, Inc.,*
137 F.3d 844 (5th Cir1998) ...........................................................44

*Sullivan v. DB Investments, Inc.,*
667 F.3d 273 (3d Cir. 2011) ..........................................................36

*In re Synthroid Marketing Litigation,*
264 F.3d 712 (7th Cir. 2001)..........................................................44

*In re TFT-LCD (Flat Panel) Antitrust Lit.,*
822 F.Supp. 2d 953 (N.D. Cal. 2011) ............................................41

*In re Toyota Motor Corp.,*
Case No. 8:10ML 02151) ...............................................................26

*United States v. Hinkson,*
585 F.3d 1247 (9th Cir. 2009).........................................................2

*United States v. LSL Biotechnologies,*
379 F.3d 672, 683 (9th Cir. 2004)..................................................41

*United States v. Visa U.S.A., Inc.,*
163 F. Supp.2d 322 (S.D.N.Y. 2001) ..............................................4

*Van Vranken v. Atlantic Richfield Co.*,
901 F. Supp. 294 (N.D. Cal. 1995) ................................................................32

*In re Veritas Software Corp. Sec. Litig*,
2006 WL 463509 (N.D. Cal. Feb. 24, 2006)....................................................50

*In re Visa Check/Mastermoney Antitrust Litigation*,
297 F. Supp.2d 503 (E.D.N.Y. 2003)..............................................................20

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002)........................................................................50

*Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 1995) .............................................................................19

*In re Washington Public Power Supply Litigation*,
19 F.3d 1291 (9th Cir. 1994)..........................................................................34

*Wininger v. SI Management L.P.*,
301 F.3d 1115 (9th Cir.2002)..........................................................................50

## Statement Requesting Oral Argument

Counsel for the Objector-Appellant, Alex Martinez, respectfully requests 30 minutes of oral argument to assist the Court in evaluating the issues presented in this appeal.

## Statement of Subject Matter and Appellate Jurisdiction

The district court had federal question jurisdiction of this action under the Sherman Act, 15 U.S.C. §1. *See also* 28 U.S.C. §1331 and §1337. The district court also had supplemental jurisdiction of the state law claims. 28 U.S.C. §1332 and §1367. The district court entered a final Federal Rule of Civil Procedure 54(b) judgment. (Dkt. 7697). The Objector-Appellant timely filed a notice of appeal Alex Martinez (7791). This Court has jurisdiction to review a final judgment. 28 U.S.C. §1291.

## Statement of the Issues

I.    Whether the district court abused its discretion when it awarded a fee of 28.6% to counsel for the class members.

II.   Whether the the objector is entitled to an award of attorney's fees if it prevails in this appeal.

## Standard of Review

A district court's decision as to method of calculation and amount of a fee award to class action counsel is reviewed for abuse of discretion. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1046 (9th Cir. 2002). "A district court abuses its discretion if its decision is based on an erroneous conclusion of law," *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 270 (9th Cir.1989), or if its "application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (internal quotations and footnotes omitted).

## Statutes and Rules

### Federal Rule of Civil Procedure 23(h). Class Actions.

Attorney's Fees and Nontaxable Costs. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

### *Introduction*

This is an appeal from a class action order awarding plaintiff's lawyers over $308 million in attorney's fees, plus approximately $8.7 million in "costs." The class members netted roughly $750 million. Stated differently, the class action lawyers received fees equaling 28.6% of the total recovery.

The case, an antitrust dispute, was never tried. Nor were any orders appealed to decision. And the plaintiff's lawyers enjoyed a distinct advantage: all of the defendants but two had pled guilty or been convicted thanks to the tireless work of the U.S. Department of Justice--which had prosecuted the antitrust case while the plaintiff's lawyers took a two-year break from merits discovery. The plaintiffs' lawyers also enjoyed the support of the attorneys general of eight states. (Those lawyers were satisfied with having the class pay an additional fee equal to 1% of the total recovery.)

The appellant, an objector to the private fee award, challenges both the methodology and the result of the trial judge's blessing of the $300 million fee award to the class action lawyers. Below, the appellant points out that the closest case to the one before the Court, *Wal–Mart Stores v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 1995), involved plaintiff's lawyers who had "achieved extraordinary results " and "did not have the benefit of 'piggybacking' off of a previous case-instead, the Government piggybacked off of plaintiffs' counsel's work by using it in *Government's*

3

*Membership Rules* [*i.e.*, *United States v. Visa U.S.A., Inc.*, 163 F. Supp.2d 322 (S.D.N.Y. 2001), *modified by* 183 F. Supp.2d 613 (S.D.N.Y.2001), *aff'd* 344 F.3d 229 (2d Cir. 2003), *cert. denied*, 125 S.Ct. 45 (2004)]." 396 F.3d at 122.   Even then the court found that an award of 6.5% was appropriate. *Id*. at 106.

The contrast here is stark: where the lawyers seek literally more than four times as high a percentage, yet slipstreamed the work of the DOJ.   Despite the court of appeals decision in *Wal-Mart*, the court in this case was guided by a district court order from Miami, *Allapattah Services v. Exxon Corp.*, 454 F. Supp.2d 1185 (S.D. Fla 2006), a non-antitrust case.   The special master in this case found that similarities with *Allapattah* were "striking[]," yet *Allapattah* is the exception that proves--with "striking" clarity--how excessive the fee award to the plaintiff's lawyers here is.   As the judge in *Allapattah* explained, "The factual and legal framework out of which [*Allapattah*] arose made it an extraordinarily difficult case, which required great legal skill to achieve the unprecedented outcome." *Id*. at 1206.   The differences between the two cases could not be more stark.   The only thing they have in common is big numbers.

## STATEMENT OF THE CASE

Plaintiffs and several states filed a class action against several manufacturers of TFT-LCD flat panels, alleging that the Defendants conspired to fix prices of the flat panels in violation of the antitrust laws, resulting in overcharges to consumers who bought TVs, monitors or notebook computers containing the flat panels. The district court certified separate classes associated with direct and indirect purchaser plaintiffs ("IPPs"). The IPP class was defined as:

> All person or entities in one of 24 states or the District of Columbia who, from January 1, 1999 to December 31, 2006, as residents of one of those 24 states or the District of Columbia, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in one of those 24 states or the District of Columbia indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.

(Dkt. 3198). The district court's opinion of April 3, 2013, provides a valuable overview and summary of the indirect purchaser proceedings. *In re TCT-LCD (Flat Panel) Antitrust Lit.*, 2013 WL 1365900 (N.D. Cal. April 3, 2013).

> This antitrust class action stems from allegations of a global price-fixing conspiracy in the market for thin-film transistor liquid-crystal display panels ("TFT–LCD"). TFT–LCD panels are used in a number of products, such as computer monitors, notebook computers, and televisions. * * * Defendants manufacture the panels, which are then sold and assembled into finished products. The panels have no independent utility, and are not available to the average consumer. Instead, they are incorporated into finished products as discrete, physical objects within the product.

* * *

5

> Plaintiffs are a class of retail purchasers who purchased products containing TFT–LCD panels in the United States. The indirect purchaser plaintiffs filed this multi-district antitrust class action on behalf of all persons and entities who indirectly purchased TFT–LCD panels (contained in TFT–LCD products) manufactured, marketed, sold and/or distributed by one or more of the defendants, for the indirect purchasers' end use and not for resale. * * * Plaintiffs bought TFTLCD products containing TFT–LCD panels either from (1) TFT–LCD panel direct purchasers, such as Dell, Hewlett–Packard, and Apple, which incorporate TFT–LCD panels into final, branded TFT–LCD products and sell directly to the public, or (2) retailers, such as Best Buy, Wal–Mart, or Target, which acquire the TFT–LCD products from TFT–LCD panel direct purchasers or distributors.
>
> Plaintiffs alleged a "long-running conspiracy extending from at least January 1, 1999 through at least December 31, 2006, at a minimum, among defendants and their co-conspirators, the purpose and effect of which was to fix, raise, stabilize, and maintain prices for LCD panels sold indirectly to Plaintiffs and the members of the other indirect-purchaser classes. . ." Plaintiffs sought equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, based on alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as restitution, disgorgement, and damages under the antitrust, consumer protection, and unfair competition laws of 23 states.

*TCT-LCD (Flat Panel) Antitrust Lit.*, at *1-2. Of significant note is that most all of the settling civil defendants had been subject to U.S. Department of Justice prosecution, and were either convicted or pled guilty to criminal violations involving the cartel conspiracy that was the basis for this class action pressing violations of federal antitrust law and associated State law damages claims. (Dkt. 7127:9-10). The district court's opinion on fees identifies this point:

6

> The Court also recognizes the not-insignificant risk involved in litigating the claims at issue. Although some risk was lessened on account of parallel criminal price-fixing charges and guilty pleas, other factors complicated the IPP's case.

*TCT-LCD (Flat Panel) Antitrust Lit.*, at *7.

The district court appointed the special master previously assigned to the merits portion of this case to consider the attorney's fees and related expenses requested by the "Indirect Purchaser Plaintiffs" class action counsel and for reimbursement by the various state attorneys' general offices litigating this case. (Dkt. 6580). This assignment was made at the end of August 2012 in order to provide a report and recommendation regarding attorneys' fees and costs to be awarded the IPP class counsel and the State Attorneys' General. (Dkt. 6580). On November 29, 2012, the district court conducted a fairness hearing and then on January 31, 2013, it held a hearing on attorneys' fees, expenses and incentive awards. *In re TCT-LCD (Flat Panel) Antitrust Lit.*, 2013 WL 1365900 at *1.

With respect to attorneys' fees for the IPP class attorneys, the district court adopted the findings of the special master, except with respect to one law firm, which had the effect of slightly increasing the fee percentage from 28.5 to 28.6% of the common fund. *TCT-LCD* at *7. All timely objections to the fee award were rejected, and all fee requests made by objectors were denied. *Id.* The total settlement amount approximates $1.08 billion, of which 28.6% is to be shared

among class action counsel. *Id.*    The objections that frame this appeal do not challenge the State AG Office fee awards.

**STATEMENT OF THE FACTS**

**1.     IPP Class Counsel's Fee Request:**

Of the common settlement fund of $1,082,055,647, IPP counsel applied for a fee of $308,385,859, which constituted 28.5% of the settlement fund.  They also sought $8.77 million in common litigation costs. (Dkt. 5157, 6664).   The State attorneys' general separately sought attorneys' fees of $11,054,191.01, about 1% of the fund, and reimbursement of costs of $1,206,479.48. *In re TCT-LCD (Flat Panel) Antitrust Lit.*, 2013 WL 1365900 at *14.

**2.     Objection appealed here:**

The Objector submitting this appeal is a class member: Alex Martinez, Weston, Florida, purchased one television and one notebook computer containing LCD Flat Panels in Florida during the class period. (Dkt. 6993:2).

**3.     How IPP Class Counsel's Supported Their Fee Request:**

Class counsel submitted Declarations in support of their fee, with two firms' counsel also taking the lead in presenting the overall basis for the percentage requested (28.5%), by summarizing the factors they believed supported the total percentage-of-the-fund award, including an upward adjustment from the 25 percent benchmark. (Dkt. 6662:1; 6666:7-8).   To be explained more fully below

8

with respect to the special master's consideration of them, counsel also submitted summarized, **<u>annual</u>** tallies of the hours they had performed with generalized task categories associated with them. (Dkt. 7127:2). The special master did not review any original documentation kept by the IPP counsel firms in order to make his recommendation, including his lodestar cross-check calculation. (Dkt. 7127:3).

Counsel also filed expert submissions. (Dkt. 6662:3-13). One, by law Professor Brian Fitzpatrick, was supplied to justify the use of a baseline of 25% for the fee award, as well as the upward adjustment of the fee, despite the super mega-fund nature of this case. (Dkt. 6662:3-5). Another, by Richard M. Pearl, was directed to the lodestar and multiplier calculations. (Dkt. 6662:6-13).

### 4.    Nature of the Objections:

Several objections to the attorneys' fee were lodged for the special master's consideration (and thereafter to the district court upon the special master's rejection of those objections). (*See e.g.*, Dkt. 6993, 7199; *cf.* Dkt. 7149, 7153, 7173, 7175, 7177, 7178, 7180, 7181, 7185, 7187, 7189, 7193, 7196, 7198, 7202, 7205, and 7209).

Principally, objectors argued that the fee should be calculated based on the majority rule that the percentage of a class fund awarded to counsel generally declines from the benchmark percentage in mega-fund cases, and certainly should decline in what would reasonably be termed a "super mega-fund" (over $1 billion) circumstance. (Dkt. 6993:2-3).   Particularly where the case was aided, as it was here, by a plethora of criminal guilty pleas entered into by the principal civil defendants (and in one case a conviction), and where the civil case was settled without trial, objectors contended that the percentage fee should not exceed the baseline of 25% and should be lower still, given the more appropriate reduction of the percentage-of-the-fund fee for larger class action recoveries. (*Id.* at 2).   After all, they objected, to some extent the risk attendant to an adverse result was mitigated by the price-fixing guilty pleas. (Dkt. 7199:5).

In further relation to the result obtained, they contended that the potential for a treble-damages award should have been applied in this case--given that it was aided by those criminal convictions. (Dkt. 6993:10; 7199:3-4). While admittedly a discretionary consideration for the award of fees based on precedent, they pointed out that such consideration was appropriate here, where liability was in part previously established by the DOJ and the various state attorneys' general work establishing the cartel activities of the conspiring defendants. (Dkt. 6993:5; 7199:5). Moreover, claims of complexity of the work product were conflated with the sheer quantity of work, given the very large fee proposed, and in any event exaggerated by characterizations detached from discrete discussion of the work performed. (Dkt. 7199:4).

Objectors also contended that the claimed $148,000,000 lodestar should not be used to justify the fee award, both as a matter of procedure and substance. (Dkt. 6993:6; 7199:2-3). This challenge to process rested upon the fact that the special master by his own acknowledgment did not review any primary source records and relied significantly upon *ex parte* communications with class counsel to determine the fee. (Dkt. 7199:2). Moreover, the time between the lodging of the fee request and its review, as well as the time for objection after the special master's report and recommendation was released, could not plausibly allow for the time it would require to have the opportunity to consider seriously the lodestar as a cross-check

11

on the percentage of the fee award. (Dkt. 6993:6-7; 7199:2-3).   Nonetheless, in substance the Objectors urged that there would be severe waste attendant to trying to perform a genuine lodestar cross-check in a case of this magnitude. (*Id*.).   Hence, the argument was advanced that the district court should not have considered the lodestar to bolster the 28.6% of the fund fee ultimately awarded. (Dkt. 6993:3, 6-7; 7199:2-3).  Rather, the district court should have applied only a pure percentage-of-the-fund approach to determine the fee award, and should have made a downward adjustment in light of the size of the percentage-of-the-fund award generated by the size of the common fund established. (Dkt. 6993:8).

Objectors contended as well that to the extent "non-monetary benefits" of the settlement caused the special master to make an upward adjustment of the fee, they should not have. (Dkt. 7199:7).   Those benefits were nominal or illusory, including as they did the fact that some defendants had cooperated with class counsel (a factor subsumed by the elements framing a fee that involve the skill of counsel), and that certain defendants would not engage in unlawful practices for five years, and would maintain or initiate antitrust compliance programs. (*Id*.).

### 5.    The Special Master's Ruling:

The district court appointed the special master at the end of August 2012 to make a report and recommendation regarding attorneys' fees and costs for the IPP class counsel and the State Attorneys' General. (Dkt. 6580).   The special master

was authorized to conduct *ex parte* communications with counsel and to request any information and evidence necessary to determining the amount of the award. (Dkt. 7127:2). He took advantage of this very flexible approach, convening meetings jointly and separately with lead and liaison IPP class counsel. (Dkt. 7127:3). He asked the two co-lead counsel and "Liaison Counsel" "to each provide me *ex parte* on a confidential basis with his own recommendation of how to allocate the ultimate fee award among the 116 Class Counsel law firms." (*Id.*)

The special master requested and obtained "analyses of how the total attorney hours were divided among different broad tasks (e.g., pleadings, motions, discovery, settlement, etc.)" (Dk. 7127:3, 14). While he asked that "Class Counsel's contemporaneous detailed time records be available for [him] to review and sample as necessary . . . [he did not find] "it necessary to do so." (*Id.*).

His report and recommendation expressed the "difficulties IPP Plaintiffs faced in establishing a sufficiently credible case to force defendants to pay in settlement one-half of the claimed damages." (*Id.* at 5). Hence, his view was that the only serious consideration was whether to make an upward departure from the 25% baseline. (*Id.* at 5). The special master considered the settlement at 50% of the compensatory damages "an extraordinarily good result for the Class" . . . "particularly true given the complexity of the case, the notorious difficulty in proving damages and causation in indirect purchaser cases, and the risk presented

13

by several important legal issues that could have gone against Plaintiffs at trial or on appeal." (*Id.* at 6).

Having recommended an upward adjustment based on this analysis of results achieved, the master also viewed the complexity factor in like manner for an increase from the 25% baseline at which he had commenced his analysis. (*Id.* at 7-9). While having prominently referenced "complexity" in his discussion of results achieved, the special master elaborated on the nature of those complexities, including having to establish class certification on the basis of the amount of overcharges," (*Id.* at 7-8); their pass-through and ultimate damages to indirect purchasers. *Id.* The special master also referenced the victories achieved in facing a dozen summary judgment motions, including the motion that interposed the Foreign Trade Antitrust Improvement Act ("FTAIA"), noting it "posed particular risk." (*Id.* at 8). He referenced in particular that the case proceeded with damages claims "under the laws of 23 different states" and that "proof of damages in indirect-purchaser cases is notoriously difficult." (*Id.*). And that those damages claims had to be "credibly support[ed]" by experts, who would need to have solid opinions defended at depositions and successful against a *Daubert* motion to bar them from testifying." (*Id.*).

The special master then enhanced the fee again under the "risk assumed by counsel factor," albeit acknowledging:

14

> At first blush this case may have seemed risk-free. After all, the defendants (other than Toshiba which was not charged by DOJ and Samsung which sought amnesty) all had pleaded guilty to price fixing of LCD panels. The companies paid large fines and several executives served jail time. Therefore, IPP Plaintiffs were greatly assisted in their task of proving that defendants had violated the antitrust laws. Risk of losing on this issue was modest at best.

(*Id*. at 9). Yet, the special master reasoned:

> But a finding of criminal guilt does not equate to liability for damages suffered by indirect purchasers of products containing LCD panels. As noted above, 1PP Plaintiffs had to surmount numerous legal obstacles, and find a credible way to present and prove enormous damages that would be recoverable under the laws of 23 states. The risk of losing any one of a number of dispositive issues was enormous. There was a serious risk that the jury would believe the eminent witnesses the defendants presented, and find that indirect purchasers of products containing LCD panels had really suffered little or no damage.

(*Id*. at 10). The master also adjusted upwards for the non-monetary benefits associated with the settlement (*Id*. at 12), and for the percentage awarded in comparable cases, relying here principally by analogy to the Southern District of Florida decision in *Allapattah Services v. Exxon Corp.*, 454 F. Supp.2d 1185 (S.D. Fla. 2006), finding it to be "strikingly comparable to the present case." (*Id*.).

Finally, with respect to upward adjustment, the master's lodestar analysis "closely tracked" the percentage of fee determined, hence it too, in his view, constituted a foundation for the upward adjustment of the fee. (*Id*. at 15). With respect to the size-of-the-fund consideration, the special master noted the "concern

in very large 'mega-fund' cases . . . that a normal benchmark percentage may wildly over-compensate counsel." (Dkt. 7127:10). Nonetheless, relying upon his lodestar analysis the special master concluded that the size of the fund was a "neutral" factor that would not resist increasing the percentage of the fee and thereby over-compensate IPP counsel. (Dkt. 7127:11).

### 6. The District Court's consideration of the fee amount:

On review of the special master's work, the district court twice referenced at the hearing on fees its concern regarding a potential windfall award. (Dkt. 7614:9-10). The district court's ruling on fees determined:

> The Court also recognizes the not-insignificant risk involved in litigating the claims at issue. Although some risk was lessened on account of parallel criminal price-fixing charges and guilty pleas, other factors complicated the IPP's case. Assessment of damages involved a difficult analysis, which required taking into account the impact of and relationship between federal and state rules concerning damage analysis, as well as constitutional limitations on duplicative damages, if any. Additionally, this case implicated provisions of the FTAIA in relatively unprecedented ways. In grappling with these complicated issues, IPP counsel prosecuted this action for six years, advancing large amounts of money to fund the many and expensive costs of litigation, with no guarantee of payout at the end. The Court considers all of these factors in making its assessment of whether to adjust the benchmark award.

*TCT-LCD* at *7. And,

> The Court has specifically considered the size of the fund and whether its recommended award would inappropriately provide a windfall for attorneys. *See* Transcript of Fee Hearing, Docket No. 7614 at 39–40. Having reviewed other cases involving large

16

Settlement Funds, the Court finds that its award is proper and fair in light of the amount and quality of the work done by the attorneys in this case. *See Allapattah Services v. Exxon Corp.,* 454 F. Supp.2d 1185 (S.D. Fla. 2006) (awarding 31.5% of a settlement fund of $1.06 billion and citing fourteen cases involving settlement funds between $40–696 billion with fee awards between 25–35% of the fund); *see also Craft v. County of San Bernadino,* 624 F. Supp. 1113, 1125 (C.D. Cal 2008) (noting that the fee award of 25% of the fund is substantially below the average class fund fee nationally). Although the different mega-fund cases involve varying degrees of complexity and risk, the Court is convinced that the complexity of this case merits the 28.6% fee award. Some objectors challenge the Special Master's finding regarding the complexity of the case as well as the degree of risk assumed by counsel, given that defendants' liability had effectively been established. However, as discussed above, these cases presented issues beyond liability which were significant, complex and numerous, and the risk assumed was substantial enough to justify an upward adjustment of the 25% benchmark. Moreover, the excellent result obtained through the Settlements warrants an award of 28.6% of the Settlement Fund.

*TCT-LCD* at *8. A timely appeal by the objector here followed. (Dkt. 7868 Alex Martinez.

17

## SUMMARY OF THE ARGUMENT

The $308 million fee award to the plaintiffs' lawyers in this class action is palpably excessive and an abuse of discretion.  At 28.6% of the gross recovery, the award violates the principle that--in order for class members to benefit from economies of scale--fee awards to class counsel should generally decline when class funds exceed $100 million.  This "mega-fund" principle has particular force where, as here, the case actually involves a fund over $1 billion (a "super mega-fund"). The lawsuit here should hardly be the exception to the rule: the case was never tried; the burden of class counsel was significantly lightened thanks to the labors of the U.S. Department of Justice and its criminal convictions against almost all the defendants; and counsel's merits discovery took a two-year hiatus so the DOJ could handle the defendants.

In a strikingly similar case, the Second Circuit held that a 6.5% fee award was appropriate--one-fourth the rate that the class member here are being ordered to pay their lawyers.  In that case, however, it was class counsel that led the DOJ, not the other way around.  But rather than follow such precedent, the lower court here chose to follow a district court fee order from Miami.  But that non-antitrust case took 14 years, was tried twice to a jury, and went all the way to the Supreme Court of the United States.  That case was *genuinely* exceptional.  This Court should vacate the fee award to class counsel and remand for further proceedings.

**ARGUMENT**

I. **THE AWARD OF AN ATTORNEYS' FEE TO CLASS COUNSEL CONSTITUTING 28.6% OF THE COMMON FUND WAS AN ABUSE OF DISCRETION.**

1. **This case is like *Wal-Mart*, not *Allapattah*.**

Two cases readily demonstrate the excessiveness of the fee award in this case. Ironically, the special master (and, by extension, the district court judge) relied on one of them to justify that award. Below, we will discuss both.

In *Wal–Mart Stores v. Visa U.S.A., Inc.,* (approving district court's fees award of 6.5% of $3 billion fund), the world's largest retailer led a class of approximately five million merchants challenging the practices of Visa U.S.A. and MasterCard International as illegal tying arrangements and anti-competitive practices under the Sherman Act, 15 U.S.C. §§ 1, 2. The plaintiff's class sought billions of dollars in damages. *Wal–Mart*, 396 F.3d at 101.

The Second Circuit affirmed the district court's fee award, agreeing that the *Goldberger*[1] factors "compel[led] an 'extraordinary' fee under [the] circumstances" in the case, which the court explained were:

> lead counsel devoted tremendous time and labor to this case for seven years; antitrust cases, by their nature, are highly complex; this case was especially large and complicated, involving almost every U.S. bank and more than five million U.S. merchants; the risk of the litigation was very high; lead counsel devoted 52% of its legal staff to work on a case that spanned seven years without any guarantee of recovery; plaintiffs'

---

[1] *I.e.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

19

counsel achieved extraordinary results; plaintiffs' counsel did not have the benefit of "piggybacking" off of a previous case-instead, the Government piggybacked off of plaintiffs' counsel's work by using it in *Government's Membership Rules;* even a very large fee award would be a small percentage of the settlement fund; and the Settlement produced "significant and lasting benefits for America's merchants and consumers."

*Wal-Mart*, at 396 F.3d at 122, (quoting *In re Visa Check/Mastermoney Antitrust Litigation*,

297 F. Supp.2d 503, 523-24 (E.D.N.Y. 2003)).

Nonetheless, "[a]sserting its jealous regard for absent class members, the [district] court sought to compensate plaintiffs' counsel handsomely and at the same time limit the percentage of the award so that plaintiffs' counsel would not receive a windfall detrimental to the class":

Were the Fund not so large, dwarfing the funds in all of the cases Lead Counsel have cited, a larger percentage might be appropriate. But given the circumstances as they are, my award is appropriate. Only in comparison to the amount sought can it be considered anything but generous.

*Wal-Mart*, 393 F.3d at 122, quoting *Visa Check III*, 297 F. Supp.2d at 525 (footnote omitted).  Given the very large size of the fund in question, and "recognizing that economies of scale could cause windfalls in common fund cases," the district court reduced the requested fee percentage from 18.5% to 6%. *Id.*  The Second Circuit agreed, explaining that:

While courts in megafund cases often award higher percentages of class funds as fees than the district court awarded in this instance [internal citation omitted] the sheer size of the instant fund makes a smaller percentage appropriate. ... the district court's decision in favor of

> protecting the instant class from an excessive fee award militates against awarding attorneys' fees based purely on economic incentives.

*Id.* at 123. Furthermore, the Second Circuit could not imagine the reduction in fee would be a disincentive to other attorneys to pursue such claims. *Id.* It referred to the district court's pithy comment that:

> "If [this fee award] amounts to punishment, I am confident there will be many attempts to self-inflict similar punishment in future cases." We agree.

*Id.*

By way of comparison with the current case, the district court viewed the work done by counsel in *Wal-Mart* as similarly extraordinary and worthy of a fee respecting the high caliber of their work. *Id.* at 122. Time, skill, labor and complexity of the antitrust case were all mentioned as factors in this *extraordinary* work effort, which had spanned seven years. *Id.* Unlike this case, however, the civil work on behalf of the class could not "piggyback" the government; in fact, the government had piggybacked class counsel's work. *Id.* Yet, the Second Circuit found a fee award equaling 6.5% percent of the recovery to be mete and proper-- not, as here, a more than *four*-fold fee of 28.6%.

In *Allapattah Services v. Exxon Corp.*, 454 F. Supp.2d 1185 (S.D. Fla. 2006)--a non-antitrust case that the special master here found "strikingly comparable to the present case," the district court judge awarded a much larger fee than in *Wal-Mart*: 30%. The judge forcefully explained, however, that the case was "unique":

> This is a case that has lasted fifteen years, resulted in two trials, extensive appeals including before the United States Supreme Court, a hotly contested Claims Administration Process, and a settlement whereby Class Members will receive their full compensatory damages and nearly all of their prejudgment interest.
>
> This is a unique class action suit with a long history. [footnote omitted] As suggested by [class counsel] it is fair to say that nearly all federal class actions end by dismissal, summary judgment, or settlement. Few are resolved by trial. Fewer still are decided by an appellate court. Almost none reach the Nation's highest court. None that I can find have involved a comprehensive claims administration process that has been so highly contentious. None has resulted in a settlement after trial and appeal whereby, at the end of the day, over 11,000 Class Members will receive full compensation of their claims, including nearly all of their prejudgment interest. This class action is the exception to every one of these particulars.
>
> Objectors . . . have argued that, as the total recovery increases, the percentage allocated to fees should decrease. While such an approach may have validity when there is a large settlement short of a full trial, I conclude that the rationale has no reasonable application in this unique case for the reasons I have already discussed.

*Allapattah*, 454 F. Supp.2d at 1212-13.

This case is undeniably different from *Allapattah*. Here there was no trial, much less two trials. Nor was there <u>any</u> appellate decision, much less one from the Supreme Court of the United States. Where the *Allapattah* litigation took 15 years, here it took six, and there was a stay of the merits discovery of effectively two

years,[2] or approximately one-third of that time, as the private lawyers waited on the DOJ to gather helpful convictions. Nonetheless, the master awarded an *Allapattah*-like fee, deeming that case "strikingly comparable to the present case" albeit he,[3] and more importantly, the district judge presiding in *Allapattah* strongly recognized that the latter was "unique."

The differentiating features of *Allapattah* make it a launching point for a discussion of how an extraordinary result differs from a merely excellent result, and why that should implicate a divergent outcome with respect to fees to be awarded IPP class counsel. Successfully facing difficult legal issues pretrial and preparing for trial is quite different in terms of risk than it is to actually run the gauntlet of two trials, an appeal on the merits to the circuit court of appeals and then to the Supreme Court. That latter hurdle was cleared with the slimmest margin of a 5 to 4 decision on a two-court circuit conflict regarding the amount-in-controversy

---

[2] Merits discovery was formally stayed between September 2007 and January 2009. While that stay was lifted in January 2009, depositions did not recommence until September 2009. (Dkt. 300; 631; 6666:13-14). In June 2011, counsel for Plaintiffs begin reaching settlements with the Defendants and settled with the last three Defendants in April 2012. (Dkt. 6666:13-14)

[3] The special master drew a laser-like association between this case and *Allapattah*, although he acknowledged that "in *some respects* it differed from this case: it lasted fifteen years instead of six; it involved two trials and an appeal to the U.S. Supreme Court; the class recovered 100% instead of 50% of its loss. But in terms of the size of the settlement, *Allapattah* provides a very helpful comparison and a demonstration of the reasonableness of a 28.5% award in this case." (Dkt. 7127:12-13)(emphasis supplied).

requirements over joined claims by way of supplemental jurisdictional. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549-551 (2005). Had one vote switched sides, it would have significantly reduced the common fund recovery.

Indeed, this case is palpably different even from *Wal-Mart*. Here, the private civil litigation took a back-seat to the work done by the DOJ--with private counsel taking what amounted to a 24-month long stay from merits litigation, while the DOJ gathered convictions and guilty pleas. As even the special master in this case acknowledged:

> [T]he defendants (other than Toshiba which was not charged by DOJ and Samsung which sought amnesty) all had pleaded guilty to price fixing of LCD panels. The companies paid large fines and several executives served jail time. Therefore, IPP Plaintiffs were greatly assisted in their task of proving that defendants had violated the antitrust laws. Risk of losing on this issue was modest at best.

And the district court similarly conceded that some of the "risk was lessened on account of parallel criminal price-fixing charges and guilty pleas, other factors complicated the IPP's case." *TCT-LCD* at *7.

It is hard to imagine that a similar percentage recovery protocol could lead to the dichotomous results in *Wal-Mart* and this case. The chasm between 6.5% and 28.6% of the fund fees in two complex anti-trust cases is too wide not to bend even the tolerance level afforded by the abuse of discretion standard. Indeed, when accounting for the State attorneys' fees awarded, the percentage of the fund the

class members are being ordered to pay approximates a 30% payment by class members, almost a 5:1 ratio to *Wal-Mart*.  When one further considers that this case was aided and abetted on liability by the DOJ's criminal convictions of all but two LCD defendants, whereas *Wal-Mart* was not, the reasonableness of the fee award in this case entirely dissipates.

Professor Fitzpatrick's attempts to close that unreasonable chasm are unpersuasive (see below).    Certainly, his efforts to analogize the utterly distinguishable *Allapattah* are all the more chasm-widening.   More critically, that opinion imbued the special master's R & R with error, when he adopted it as his own, finding the utterly distinguishable *Allapattah* to be strikingly comparable to this case, when the reality was that the compellingly extraordinary work performed in *Allapattah*, as well as the *unique* result in that case, were not comparable at all.

## 2. The amount of the percentage of the fund fee awarded here was excessive when compared to similar large common fund cases.

The special master was significantly influenced in his reasoning by the expert opinion of plaintiff's counsel's expert, Professor of Law Brian Fitzpatrick. (Dkt. 7127:12-13).  The professor's declaration claimed to provide buttressing empirical support for the eventual fee award made here, by reference to the size of other percentage of the fund awards. (Dkt. 6662-3:12-13).

We must pause here to note the cottage industry Professor Fitzpatrick has successfully established for himself, when it comes to providing expertise on behalf of class counsel fee awards. He has written extensively on the subject, providing data on federal class action settlements, including mega funds. *E.g*, Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811, 839 (2010).

Indeed, bootstrapping already is evident; the professor's work is cited one place in support of his work elsewhere, setting what amounts to a "Fitzpatrick Fee" standard, which in mega fund cases disquietingly exceeds the results of his previous empirical study, discussed below. *See In re Toyota Motor Corp.*, Case No. 8:10ML 02151 JVS (FMOx) (E.D. Cal. June 17, 2013) (positively discussing *TCT-LCD (Flat Panel)* fee award and reflecting substantially similar analysis to that conducted here by the district court).

However, Professor Fitzpatrick's prior empirical study finding drastically *lower* percentage awards in mega fund cases has been prominently utilized:

> According to one study, in cases involving common funds "from $500 million to $1 billion" in 2006 and 2007, "the mean and median awards were both 12.9%" of the fund. *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp.2d at 1033 (citing Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811, 839 (2010)).

*In re Black Farmers Discrimination Lit.*, 2013 WL 3480346 at *15 (July 11, 2013)

26

(awarding 7.4 percent of the fund award constituting $90,835,000).

Despite his empirical study finding the mean and median awards to be 12.9% of the fund in mega-fund cases, Professor Fitzpatrick maintains here that an award of 30% is reasonable in a *super* mega-fund circumstance. There is a stark, and we urge an awkward, advocacy-driven deviation between the empirically derived 12.9% for mega-fund cases, and his expert contention here, in the face of huge mega-fund, for as much as a 30% award.

Not surprisingly, Professor Fitzpatrick relies prominently on *Allapattah*, in spite of the obvious differences demonstrated above, to justify the fee awarded here. (Dkt. 6662-3:16). With respect to the eight mega-fund cases Professor Fitzpatrick considered in which fees exceeded the 25% benchmark, (Dkt. 6662-3:17-18), none, apart from *Allapattah*, which has been rigorously distinguished, were common funds of the magnitude addressed here. The closest was a $410 million common fund of which counsel was awarded 30%. *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011). In short, the remaining seven cases were not remotely close to the magnitude of the common fund here, and the amounts actually awarded in fees were thus nowhere near the sum here, thus, they do not support the "comparable" fund case component of Fitzpatrick's analysis. (Dkt. 6662-3:17-18).

Instead, as the Fitzpatrick empirical study confirms, and *Wal-Mart* exemplifies, the larger mega-fund case results are not meaningfully reconcilable with the decision of the district court. *E.g*, *Wal–Mart*, 396 F.3d at 122 (approving district court's award of 6.5% of $3 billion fund); *In re Black Farmers Discrimination Lit.*, 2013 WL 3480346 at *15 (July 11, 2013) (awarding 7.4 percent of the fund award constituting $90,835,000); *In re Enron Corp. Securities, Derivative & "ERISA" Litig*, 586 F. Supp.2d 732, 740, 828 (S.D.Tex.2008) (approving award equal to 9.52% of $7.2 billion fund).

Professor Fitzpatrick is left then to argue policy, rather than empirical data when it comes to mega fund awards, because the data simply does not support his narrative arguments.  Hence, he urges that the use of a sliding-scale reduction in fee percentage is not warranted for mega-fund cases, because it will often serve as a disincentive for counsel to pursue "small-stakes" cases and can create economic distortions in the settlement of cases.  Professor Fitzpatrick does not acknowledge the obvious wrinkle that in this case there was no dearth of interest by would-be attorneys to pursue this class action, as over 100 firms engaged in this matter on behalf of the indirect purchaser classes and hung in for six years' worth of litigation.

Indeed, his criticism respecting a sliding scale for mega-funds is raw speculation, familiarly referencing the hypothetical example where "rational" class

counsel is emboldened by purely economic reasoning to settle for less on behalf of the class in order to avoid a larger recovery that would inflict a smaller fee based on a lower percentage of the fund award. (Dkt. 6662-3:16). This presumption that class counsel would depart from their zealous advocacy of clients, unbounded by ethics, is speculative and rests on the theory of the purely economically driven hypothetical lawyer who cares not about anything but his or her own personal profit.

This mere policy argument, whatever its wisdom, should not outweigh the more principled point that the class action mechanism is intended to provide an economy of scale that allows for such claims to be brought in the first place, and there is good reason to pass along this benefit to class members, rather than further enriching class counsel:

> Where the common fund is worth many millions or even billions of dollars—in so-called 'megafund' cases—an appropriate fee may be considerably less than twenty percent of the fund," [where]"courts most stringently weigh the economics of scale inherent in class actions in fixing an appropriate per cent recovery for reasonable fees.

*In re Domestic Air Transp. Antitrust Litig* ., 148 F.R.D. 297, 351 (N.D.Ga.1993). The class action instrument is intended to produce an economy of scale that promotes both opportunities for representation and efficiencies in that representation. In this case, the size of the fee awarded may well create an incentive for other litigators to follow, but it appears here to have been an unnecessarily excessive inducement.

Moreover, it ignores any economy of scale by creating a fee-paying relationship between class counsel and each class member that approximates an ordinary case of singular representation, contingent fee structure. As the percentage method is typically more lucrative for class counsel, class actions are becoming more enticing to entrepreneurial attorneys. But that does not mean that the court should abandon all restraints in that cause, which will surely come at the expense of class members and society at large. As the Fifth Circuit reminds us:

> [T]he class action device exists primarily, if not solely, to achieve a measure of judicial economy, which benefits the parties as well as the entire judicial system. It preserves the resources of both the courts <u>and the parties</u> by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 410 (5th Cir. 1998); *see also Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471 (5th Cir. 1986) ("The purpose of class actions is to conserve 'the resources of both the courts <u>and the parties</u> by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion.'" (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (internal citation omitted))).

Therefore, courts police awards to assure that the mere size of the class action does not create a fee, whether termed windfall or not, that is based more on the arbitrary size of the class or the recovery, than on the efforts of counsel. *See Goldberger*, 209 F.3d at 52 ("Obviously, it is not ten times as difficult to prepare, and

try or settle a 10 million dollar case as it is to try a 1 million dollar case." (internal quotation omitted)); *In re Prudential Ins. Co.*, 148 F.3d 283, 339 (reducing percentage of fee due to size of fund, explaining "the basis for this inverse relationship is the belief in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.").  While objectors readily acknowledge that precedent in the circuits does not mandate reduction of the fee in every mega fund case, we urge that the case before the Court cries out for such a reduction, where the formulaic application of a benchmark imposed a largesse not consistent with, for example, the more realistic fee percentage of *Wal-Mart* or the extraordinary efforts of counsel in *Allapattah*.

Not surprisingly, as to *non*-mega-fund cases in this circuit, many are grouped about the benchmark and within several percentage points of its range, and as even Professor Fitzpatrick acknowledges, the written reference to a benchmark itself causes awards to be made or settled within range of the benchmark. (Dkt. 6662-3:13-14).   His analysis is unpersuasive that common funds in these vastly lesser-result cases should be compared to a fund of the very largest size. (*Id*. at 14).

Moreover, this Court's jurisprudence, while not condemning such comparisons, has not condoned them. *See Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (district courts may consider unusual circumstances that would "indicate that the percentage recovery would be either

31

too small or too large in light of the hours devoted to the case or other relevant factors."); *see also Vizcaino*, 290 F.3d at 1047 (fund size may make 25% benchmark rate "inappropriate … starting point for analysis … in some cases.")

In *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 296 (N.D. Cal. 1995), the district court was faced with a request for a 40% of the fund fee in an almost $77 million common fund case.   Under the comparable size factor, it found unpersuasive the presentation of many cases with smaller funds where the percentage fee requested was within the range awarded. *Id.* at 297-8.   Rather, despite "commendable efforts" from class counsel, the "request for a 40 percent fee fails to account for the size of the $76 million common fund." *Id.* at 297.   The court compared the amount of the fund to fee recoveries for funds in both the $51-75 million range and to awards "in megafund cases with class recoveries of $75-200 million, [where] courts are even more stringent, and fees in the 6-10 percent range and lower are common." *Id.* at 298.   Ultimately, the district court reduced the requested fee to 25 percent from the requested 40 percent. *Id.*

We recognize, as does Professor Fitzpatrick's declaration, that this circuit does not apply a strict formula mandating reduction of the fee as the common fund advances to mega and even super mega-fund stature.  Yet, it remains the case that with the exception of the fraught-with-distinctions *Allapattah* award, none of the mega-fund cases identified in his declaration remotely approach the size of the fee

awarded here.     And, *Wal-Mart*, which exceeded it, awarded a vastly lower percentage fee award.

> **3.     The 25% baseline percentage-of-the-fund award should not have been deemed presumptively correct in this super mega fund case.**

Moreover, in cases where this circuit has addressed larger fee awards in class action matters, it has never expressly confirmed that a baseline of 25% is necessarily a logical starting point.     In fact, this circuit's analysis, found in its seminal work on class action fees, has largely commented that a baseline of 25% may not make sense in a mega-fund setting--let alone what is clearly a super mega-fund case. See *In re Bluetooth Headset Products Liability Lit.*, 654 F.3d 935, 942-43 (9th Cir. 2011), where the Court explained:

> Applying this calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award, providing adequate explanation in the record of any "special circumstances" justifying a departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990); accord *Powers*, 229 F.3d at 1256–57; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989).

> Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result. *See In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir.1997) (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig*, 19 F.3d 1291, 1294–95 n. 2 (9th Cir.1994)). Thus, for example, where awarding 25% of a "megafund" would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead. *Six Mexican Workers, 904* F.2d at 1311; *see In re Prudential Ins. Co. America Sales Practice Litig. Agent*

> *Actions*, 148 F.3d 283, 339 (3d Cir.1998) (explaining that basis for inverse relationship between size of fund and percentage awarded for fees is that "in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel" (internal quotation marks omitted)).

654 F.3d at 942-43.

Taking a deeper dive into the Court's most formative decisions, it is clear that a 25% benchmark percentage-of-the-fund award is not presumptive in larger cases (and should certainly not be in one heralded as the largest of its kind). In *Washington Public Power Supply Litigation*, 19 F.3d 1291 (9th Cir. 1994), one of those large-fund formative decisions of this circuit, this court stated: "We agree with the district court that there is no necessary correlation between any particular percentage and a reasonable fee. With a fund this large, picking a percentage without reference to all the circumstances, including the size of the fund, would be like picking a number out of the air. * * * Because a court must consider the fund's size in light of the circumstances of the particular case, we agree with the district court that the 25 percent 'benchmark' is of little assistance in a case such as this." 19 F.3d at 1297 (considering fee request representing 13.6% or $103 million of a $687 million settlement fund).

Indeed, this Court went on to consider what might even be termed the *caprice* of settling upon a benchmark award in a large case where the legal work, though presumptively excellent, might return a considerably larger fee simply because the

bond issue in question there was double the size: "Plainly, a fee of $200 million for the same effort by counsel with the same level of skill would be a windfall rather than a reasonable fee.  In sum, the district court was correct that there is nothing inherently reasonable about an award of 13.6 percent of a fund regardless of its size." 19 F.3d at 1298.

Similarly telling is the Court's oft-cited decision in *Vizcaino*, 290 F.3d at 1047, in which the Court made clear that in cases of great magnitude "fund size is one relevant circumstance to which courts must refer . . ." And that, "the 25% benchmark rate, although a starting point for analysis may be inappropriate in some cases." *Id.* at 1050 n.4 (affirming a $27 million fee award representing 28% of the settlement fund of $97 million supported by several factors including that the "award was within the range of fees awarded in settlements of comparable size.")[4]

Where as here the special master (and hence the district court by adopting the master's reasoning) simply commenced with the presumption that 25% of the fund would be reasonable based on its constituting this circuit's "benchmark," the

_____

[4]  This brief does not dispute that this circuit has identified 20-30 percent as the reasonable range of fee awards in common fund cases, with 25% as the mid-point or benchmark. Rather, we alert the court to the features of this case, which is a "super" mega-fund result of over $1 billion and that this circuit's prominent decisions have either directly questioned the award of a fee percentage within the typical range or emphasized that the size of the fund is a critical element for consideration. *Vizcaino*, 290 F.3d at 1047 (citing *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 270 (9th Cir.1989)).

size of the fund was essentially discounted in considering the work performed in relation to the fee obtained.

### 4.   Other factors do not support the 28.6% fee award to the class counsel.

While the district court relied heavily on the exceptional nature of the result here, there are several additional points to be made in this regard that balance against giving the undue weight granted this factor below:

- The Department of Justice obtained convictions that set the stage for liability.   While other liability issues certainly existed in this civil litigation that were not involved with the criminal prosecution, those risks and complexities should have been known and anticipated by IPP class counsel.[5]   As further discussed below, the fact that those

---

[5] Some courts have expressed the view that the results in class action common fund cases should be measured by treble damages available in antitrust cases. *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 210 n. 30 (D.Me. 2003); *In re Auction Houses Antitrust Litig.*, No., 00 Civ. 0648(LAK), 2001 WL 170792, at **7-10 (S.D.N.Y. Feb. 22, 2001); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324-25 (3d Cir. 2011) *cert. denied*, 132 S. Ct. 1876 (U.S. 2012) *reh'g denied*, 132 S. Ct. 2451 (U.S. 2012).   We acknowledge that this circuit's precedent supports a discretionary determination by the district court as to whether to use the single or treble damages yardstick. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 955 (9th Cir. 2009).  Given the criminal convictions obtained here, it would appear that this case was ripe for application of the treble-damages approach.  Despite the need to expand the analysis to consider whether state law damages remedies applicable here would have allowed for trebling, this measure would have been more appropriate given the emphasis on the result here as the basis for the percentage fee.

litigation risks were known mitigates against enhancing the fee simply because class counsel were successful in settling the case.

- Many of the summary judgment proceedings involved issues of state law that were not terribly exceptional, such as the nature of a Florida law statute of limitations borrowed for a federal statute, or the required proof under a state's consumer protection law (whether affirmative misrepresentations were required or concealments sufficed, for instance). (Dkt. 3365; 3494 (plaintiffs' 10-page response simply distinguishing cases relied on by defendants is a typical example of some of the mundane work); 3307). The fact that there were, give or take, a dozen summary judgment motions filed against the class does not mean that the work of class counsel was extraordinary in achieving the results they did. This conclusion conflates the sheer quantity of work with supposed extraordinariness in meat and potatoes legal work. Success with respect to rote work does not become extraordinary by virtue of repetitive successes. This sort of legal work was common, not extraordinary. It goes on most every day in the appellate courts of states across the nation. Here, there was a lot of it because 23 states' laws were involved. The sheer magnitude of that work hardly makes it extraordinary.

- The non-monetary relief obtained was not extraordinary.  A promise not to break the existing laws is nothing more than boilerplate relief.

- There was significant third-party vendor support to provide translation services for document discovery and deposition preparation (as reflected in the enormous charges presented for those services).  So that while discovery was laborious, much of the load was carried by those not sharing in the fee, and the lawyers were reimbursed for the costs of these translation services.

- With respect to the time dimension of risk, six years is not a short period of time, albeit many complex litigation matters may well carry on that long so as to make six years also rather un-extraordinary.  Moreover, the stay of merits litigation here lasted almost two years, further reducing the time for active litigation.  The *Allapattah* case compared by the district court was 15 years in length, which is both a striking and extraordinary time to carry the burden and costs of litigation to a 100% payout of class member damages.

## 5. The risks and complexities of this litigation were not extreme risks or unduly novel.

Several further points are worthy of discussion with respect to the risk taken on by plaintiff's counsel here, seeing as how the district court in approving the special master's analysis relied on this factor as well.

38

While in litigation there is almost always risk due to uncertainty and complexity, there are degrees of such risk; this Court has itself recognized that there are reasons why a case can be "extremely risky for class counsel. . ." *Vizcaino*, 290 F.3d at 1048.   In *Vizcaino*, the absence of supporting precedents resulted in plaintiffs losing in the district court once on the merits and once on the class definition, only to revive their case twice in this Court, over dissents from both panel and *en banc* opinions. *Id*.   Class counsel's risks may also be expanded by the presence of unsettled law when they file a case. *Schiller v. David's Bridal, Inc.*, 2012 WL 211701 *11, *17 (E.D. Cal. June 11, 2012) (case pending before California Supreme Court when class action filed that could have adversely affected recovery by class); *see also Frederick v. Range Resources-Appalachia, LLC*, 2011 WL 1045665 *11 (W.D. Pa. March 17, 2011) (at filing of class action state law was unsettled then decided squarely against class counsel's primary legal argument, compelling shift in focus from legal position to factual contentions).

However, while most cases may well carry substantial risks, they are not always so extremely risky that they figure into a greater fee. *See Monterrubio v. Best Buy Stores, L.P.*, 2013 WL 2106085 *13 (E.D. Cal. May 14, 2013) (there is a difference for enhancing benchmark fee between extremely risky cases and those where substantial risks were assumed in taking on litigation; distinguishing case from *Vizcaino's* extreme risks undertaken by class counsel).

Moreover, risk in an antitrust case is considerably reduced where the case involves a prior government investigation, or finding of civil or criminal liability based on anti-trust violations. *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 WL 1213926 *12 (E. D. Pa. May 19, 2005). Risk is also reduced where, as in "typical antitrust class actions . . . the risks of litigation are spread across many law firms. . ." *Id.*

Here, the special master, and then the district court, saw this case as one where the fee was justified by factors including risk and complexity of the litigation. But this case was pursued by 116 law firms that appear to have taken a well-calculated risk. As the Court commented in *Washington Public Power* almost 20 years ago: "Although the risk was high, it was not so high that firms were reluctant to take the case. . ." *In re Wash. Pub. Power Supply Sys. Sect. Lit.*, 19 F.3d at 1301. This is not to disparage the work or success of class-action counsel. What it does say, however, is that they willingly took on known risks of relatively complex litigation, such as are regularly dealt with by adroit and experienced counsel, and they benefited greatly from the government's convictions of all but two of the civil defendants.

Moreover, as to the complex, risk-bearing legal issues noted with especial particularity by the special master and district court, these 116 law firms knew about them from the outset as obstacles that these indirect purchaser antitrust claims would surely face. They knew the state of the law restricted the scope of

40

federal antitrust remedies with respect to indirect purchasers. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Hence, class counsel knew from the outset that their damages remedy reposed in various state laws and that this would oblige them to prove up the availability of 23 or more state law remedies based on the class they assembled. Their strategy was in this respect set for them, and they accepted the risk from the outset of the case.

Similarly, they knew that at worst they would be compelled by this Court's precedent to demonstrate jurisdiction under the Foreign Trade Antitrust Improvement Act of 1982 (the FTAIA), 15 U.S.C. § 6a, which would be their burden of persuasion. *See United States v. LSL Biotechnologies*, 379 F.3d 672, 683 (9th Cir. 2004) ("The FTAIA provides the standard for establishing when subject matter jurisdiction exists over a foreign restraint of trade.").[6] This Court's *LSL Biotechnologies* precedent was also a known risk at the commencement of this litigation in 2007. Hence the bargain struck by 116 law firms encompassed the clear awareness that they were taking the known risk that they would have the burden of overcoming the FTAIA as a jurisdictional bar.

In sum, while there were risks in this litigation, they were not the *extreme* risks that *Vizcaino* iterated, or that *Allapattah's* counsel traversed. Moreover, the risks

---

[6] The history of this issue is explained in the district court's consideration of it during the course of this litigation. *In re TFT-LCD (Flat Panel) Antitrust Lit.*, 822 F. Supp. 2d 953, 958-59 (N.D. Cal. 2011).

encountered here were known risks, not the product of instability in the law that could worsen the case that had been accepted and then crafted. The very issues the district court considered carried the most risk and complexity, were challenges known from the outset.

This Court concludes that whether the percentage approach or lodestar method is applied, the fundamental inquiry is whether the end result is reasonable. *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000). The fee awarded here is excessive and an example of gross over-compensation for class counsel constituting an abuse of discretion.

### 6.     The Court should recognize the circuit conflict in determining how best to award fees in common fund cases.

There are many circuits but there is only one country. Particularly with respect to multi-district litigation it is confounding that there is such an extreme polarity between coasts in the awards of fees in common fund cases.

This national class action could have been litigated in New York City, rather than in San Francisco. *Wal-Mart's* 6.5% fee would then have been the benchmark against which this super mega fund case was compared, rather than a presumptive 25% benchmark based on non-mega-fund cases, as was adopted here by the district court. Had this case been filed on the east coast, the percentage of the fund methodology may well have derived a fee multiple millions of dollars less than was

42

awarded here, to the aggregate benefit of the same class members who are paying multiple millions of dollars more because savvy counsel filed where they did.

The dichotomous results produced with respect to the percentage of fund analysis applied here as compared to *Wal-Mart* seems incomprehensible, arbitrary, and capricious to the ordinary observer, surely constituting one or the other award an abuse of discretion.   What could logically account for the ocean-sized gap between a 6.5% fee there and, in reality, what amounts to a 30% fee (including the award for the state AGs) that the class members are being ordered to pay for the privilege of being represented in California?

This enormous gap of an almost five-to-one ratio may be explainable by the manner in which the size of the fund is accounted for, as in this circuit it is but one factor in mega-fund cases; whereas in the Second Circuit mega-fund size is the factor given greatest weight in protecting class members, subject to profound exception. *Wal-Mart*, 396 F.3d at 122, 123-24.  Or, it may be that this Court has, at least for non-mega-fund cases, set a benchmark fee of 25% about which range awards now gather,[7] regardless of size, whereas the Second Circuit, for one, has vehemently rejected a benchmark approach. *Compare Vizcaino*, 290 F.3d at 1047-48, *with Goldberger*, 209 F.3d at 52.   Regardless of its precise contours, there is a

_____

[7] See Fitzpatrick Declaration at Dkt. 6662-3:13-14.

43

variation in practice that greatly skews the results. Only the Supreme Court can resolve that conflict.

Moreover, presently, the First, Second, Third, Fourth, Eighth, Tenth, Eleventh and District of Columbia Circuits follow the percentage method, the Fifth Circuit still uses the lodestar method, *Strong v. BellSouth Telecommunications, Inc.*, 137 F. 3d 844, 850 (5th Cir1998), and the Sixth, Seventh and Ninth Circuits leave the choice of which to use up to the district court. *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245, 1247 (7th Cir. 1995); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 109 F.3d 602, 607 (9th Cir. 1997). Add to this that the Seventh Circuit pursues a market-conditions analysis of the proper fee (as opposed to the benchmark analysis of the Ninth Circuit), while also rejecting the mega-fund rule, as yet another approach to awards in common fund cases. *In re Synthroid Marketing Litigation*, 264 F.3d 712 (7th Cir. 2001); *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399 (7th Cir. 2000); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir.1998); *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir.1995); *Florin v. Nationsbank of Georgia, N.A.*, 34 F. 3d 560 (7th Cir.1994); *In re Continental Illinois Securities Litigation*, 985 F.2d 867 (7th Cir.1993); *In re Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir.1992).

The conflict in circuits is brightly transparent, and, if it remains after this appeal, should be acknowledged for purposes of Supreme Court review.

## II.   THE DISTRICT COURT ERRED IN ITS LODESTAR CROSS-CHECK, FURTHER DEMONSTRATING THAT THE AWARD OF FEES IS EXCESSIVE.

Aggravating the dubious fee award in this case, the claimed lodestar was never genuinely scrutinized, as doing so was impossible within the time available and the meaningless time "records" that were produced.[8]  The lodestar is intended to provide a cross-check on the percentage of the fund award, but in order to do so the amount of hours and their reasonableness has to be considered.

A number of flaws make reliance on the lodestar cross-check an abuse of discretion here:

- The special master never reviewed, let alone even *sampled*, original time records.  He relied upon summaries that catalogued lawyer functions at a level of generality that would not allow for a genuine determination of whether there was duplication of effort or unnecessary effort.  Given the arguments made in favor of the fee, such as complexity, risk, novelty, and time in service on behalf of the

_____

[8]  Counsel only submitted to the special master <u>annualized</u> time components classified by categories so generic as to be useless:

| | |
|---|---|
| 1. Attorney Meetings/Strategy | 8. Experts – Work or Consult |
| 2. Court Appearance | 9. Research |
| 3. Client Meeting | 10. Motions/Pleadings |
| 4. Draft Discovery Requests or Responses | 11. Settlement |
| 5. Deposition Preparation | 12. Trial |
| 6. Attend Deposition - Conduct/Defend | 13. Liaison Counsel Duties |
| 7. Document Review | |

class, these summations provided no proof of the reasonable number of hours performed. *See Barbosa v. Cargill Meat Solutions Corp.*, 2013 WL 2386605 *1 (E.D. Cal. May 30, 2013) (finding insufficient documentation submitted to do valid lodestar cross-check); *see also Ko v. Natura Pet Prods., Inc.*, 2012 WL 3945541 *12-13 (N.D. Cal. Sept. 10, 2012) (records insufficiently detailed to provide lodestar cross-check to enhance fee above percentage of fund benchmark); *Chalmers v. City of Los Angeles*, 796 F. 2d 1205, 1210 (9th Cir. 1986) ("In determining the reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended.")[9]

- This lack of discovery was aggravated by the manner in which the special master relied upon *ex parte* communications with class counsel that without discovery are the litigation equivalent of black boxes.[10] The court should not approve the fee award without providing the

_____

[9] While *Chalmers* was not itself a common fund case, district courts considering the lodestar as a cross-check in common fund cases have used it as a standard for the usefulness of attorney records submitted in support of the reasonableness of hours performed and hourly rate. *See e.g, Ko* at *8; *see also Keenan v. City of Philadelphia*, 983 F.2d 459, 472-74 (3d Cir. 1992) (use of monthly summaries to establish lodestar required district court to improperly speculate as to that part of fee award).

[10] See *In re High Sulfur Content Gasoline Prods. Liab. Litig*, 517 F.3d 220, 229-30 (5th Cir.2008), where the district court was reversed when it conducted an *ex parte* hearing to divide an attorney's fee.

class a full and fair opportunity to consider the elements establishing the lodestar. *Cf., e.g., In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) (Rule 23(h) requires notice and opportunity to be heard in opposition to the motion). While *Mercury* involved the deadline for filing objections, which should come after service of counsel's fee request, the due process point made there has significance here. Objecting counsel was not afforded sufficient time to review the lodestar materials supplied, and even those were of no consequence, as it turned out they were annualized summaries of time based on vague categories of service devoid of any meaningful detail. Add to this that the fee award was developed by the special master in considerable part *ex parte*, meant that the lodestar cross-check could not be seriously reviewed by the objectors.[11]

- While a true lodestar analysis makes little economic sense in a case of this magnitude, this circuit's jurisdiction allows for this cross-check on

---

[11] As explained in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S.Ct. 1662, 1676 (2010), involving fees awarded by statute (42 U.S.C. § 1988, not a common fund decision), the Supreme Court pointed out that the lodestar method is intended to provide "an objective and reviewable basis for fees." While determining a reasonable attorneys' fee is left "to the sound discretion of a trial judge . . . the judge's discretion is not unlimited. It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement. Unless such an explanation is given, adequate appellate review is not feasible, and without such review, widely disparate awards may be made. . ."

the fee.  Here, however, there was cumulative error in both process and substance that cannot be condoned: the absence of resort to any primary source documentation in generating the claimed lodestar; significant reliance on unreported *ex parte* communications in developing it; and, the absence of any discovery to consider the lodestar elements.  Especially where, as here, the facial amount of the claimed lodestar -- when compared against the tasks actually done -- is incredibly large, the cross-check amounted to nothing more than a formulaic repetition of the percentage of the fee review.

As a practical matter, anyone objecting to the fee does not know on this record whether hours were billed in duplicative manner for certain tasks (we can't delve below annualized "Research" or "Motions/Pleadings" for any lawyer, for example), and we are asked to ignore magnitude in relation to the commencement point for a percentage of the fund fee.  The across-the-board reduction of the hours worked by 20 percent is not a corrective measure for these errors.  It artificially insulates them, and worse, is simply a convenient way to acknowledge that a cross-check cannot be genuinely accomplished in a case of this magnitude without undue delay at enormous effort that would chill most objectors.

What makes the concern here all the more grave is that the special master's analysis, adopted for all meaningful purposes by the district court, began with an

48

assumption of the 25% baseline for *any* percentage recovery and then compounded this errant assumption by performing a lodestar cross-check from an extremely high altitude.    Thus, we face an award premised on a built-in assumption commencing at 25 percent as to the proper percentage fee, *and* a crosscheck that never once set eyes on the primary source materials that typically support the reasonableness of the hours performed.

The court should reject any consideration of the lodestar review conducted below in determining whether the 28.6 percent fee was reasonable.

## III.   THE OBJECTOR SHOULD BE AWARDED ATTORNEYS' FEES FOR INCREASING   THE COMMON FUND, ASSUMING THEY PREVAIL ON APPEAL IN ANY   MANNER THAT WOULD INCREASE THE FUND.

The legal standard for attorney fee awards to counsel for objectors is set forth in *In re Leapfrog Enterprises, Inc., Sec. Litig*, 2008 WL 5000208 (N.D. Cal. 2008):

> Counsel for objectors who confer a benefit upon the class are entitled to an award of reasonable attorneys' fees and expenses. In order to justify an award of attorneys' fees to an objector in a class action settlement, the objector must "increase the fund or otherwise substantially benefit the class members."
>
> The "substantial benefit" need not be financial. However, if an objector's actions have not produced a monetary benefit for the class, the court must carefully scrutinize the benefits conferred to determine whether the objector has conferred more than a technical or coincidental benefit. Courts have generally taken special care when awarding fees to an objector where no monetary benefit has been provided to the class.

49

*Id.* (citing *Wininger v. SI Management L.P.*, 301 F.3d 1115, 1123 (9th Cir.2002); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002); *In re Veritas Software Corp. Sec. Litig.*, No. C–03–0283 MMC, 2006 WL 463509, at *5 (N.D. Cal. Feb. 24, 2006); *In re Homestore.com, Inc.*, No. CV01–11115 PSWL (CWX), 2004 WL 2792185, at *1 (C.D. Cal. Aug.10, 2004); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392, 90 S. Ct. 616, 24 L.Ed.2d 593 (1970); *Fleury v. Richemont North America*, No. C–05–4525 EMC, 2008 WL 4829868 (N.D. Cal. Nov. 4, 2008); *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 147 (3rd Cir. 1999)).

Assuming that the objector-appellant here prevails in persuading this Court that the fee to class counsel should be reduced--and hence the fund available for distribution increased--the appellant should be entitled to an award of attorneys' fees, and the district court's order denying the appellant's conditional motion for such fees (Dkt. 7200) should be reversed.

### CONCLUSION

The district court abused its discretion in awarding a fee of 28.6% to class counsel. The decision in *Wal–Mart Stores v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 1995), provides a far more appropriate paradigm for the fee award in this case, which should be vacated and remanded to the district court for reconsideration in light of the standards in that case.

Dated: August 15, 2013

Respectfully submitted,

By:   /s/ John G. Crabtree
    John G. Crabtree
    George G. Baise
    Charles M. Auslander
    CRABTREE & ASSOCIATES, P.A.
    240 Crandon Boulevard, Suite 234
    Key Biscayne, FL 33149
    Telephone: (305) 361-3770
    Facsimile: (305) 437-8118
    jcrabtree@crabtreelaw.com
    floridaservice@crabtreelaw.com

BRIAN M. TORRES
Fla. Bar No. 036498
*Admitted Pro Hac Vice*
Email: btorres@sheftalltorres.com
SHEFTALL & TORRES, P.A.
One S.E. Third Avenue, Suite 3000
Miami, Florida 33131
Telephone: 305-358-5959
Facsimile: 855-996-9699

MICAH R. JACOBS
State Bar No. 174630
Email: mjacobs@jacobslawsf.com
JACOBS LAW GROUP SF
388 Market St., Suite 1300
San Francisco, California 94111
Telephone: 415-445-4696
Facsimile: 415-445-4697

*Counsel for Objector Alex Martinez*

## STATEMENT OF RELATED CASES
## PURSUANT TO NINTH CIRCUIT RULE 28-2.6

The following, related appeals before this Court all come from the *In re: TFT-LCD (Flat Panel) Anti-Trust Litigation*:

| Last Name of Lead Appellant | CTA9 Case No. |
|---|---|
| Bradley: | 13-15917 |
| Cashion: | 13-15934 |
| Corporate Broadcast Company, Inc. (CBC): | 13-15920 |
| Dunsmore: | 13-15915 |
| Keena: | 13-16216 |
| Martinez: | 13-15916 |
| Maxwell: | 13-15930 |
| Rest: | 12-16788 |
| Santana: | 12-16782 |

Dated: August 15, 2013

Respectfully submitted,

By: _____ /s/ John G. Crabtree _____

John G. Crabtree
*Counsel for Objector Alex Martinez*

## CERTIFICATE OF COMPLIANCE
## WITH F.R.A.P 32(a)(7)(C) AND CIRCUIT RULE 32-1

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: This brief is <u>12, 812</u> words long, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: This brief has been prepared in a proportionally spaced typeface using Pages 2009 in 14-point Baskerville font.

Dated: August 15, 2013

Respectfully submitted,

By:  <u>/s/ John G. Crabtree</u>
      John G. Crabtree

*Counsel for Objector Alex Martinez*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 15, 2013 (PST).

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


By:   /S/ John G. Crabtree
       John G. Crabtree